BIJAN DESIGNER FOR MEN, INC., Plaintiff, v ST. REGIS SHERA-
TON CORPORATION et al., Defendants.

Supreme Court, New York County, January 6, 1989

APPEARANCES OF COUNSEL

*Fried, Frank, Harris, Shriver & Jacobson (Richard M. Michaelson* of counsel), for plaintiff. *White & Case (Philip H. Schaeffer* of counsel), for St. Regis Sheraton Corporation, defendant.

## OPINION OF THE COURT

DAVID B. SAXE, J.

In Manhattan, especially, older buildings are constantly being gutted or renovated in order to keep pace with current real estate needs. Renovations and rehabilitative work are commonly performed by the owner or developer while tenants at the building are expected to carry on their customary commercial enterprises. Often, the extent and duration of the work is unanticipated by the tenant.

These situations raise interesting and important issues in the commercial real estate field where, as here, a court is requested to examine a lease term purportedly giving a landlord broad powers to renovate, in the face of a tenant's claim that the power is not so extensive.

The St. Regis Hotel, located at Fifth Avenue and 55th Street in Manhattan, was originally built in 1904 by John Jacob Astor. On November 1, 1988 it was designated by the Landmarks Preservation Committee as an official New York City landmark; the Commission termed the building "one of the most elegant and sophisticated Beaux-Arts style buildings in New York." However, the defendants state, the building has undergone neither restoration nor renovation since 1927; its heating, ventilating and air-conditioning systems are antiquated, and its electrical, plumbing, and fire safety equipment must be installed or replaced.

The premises leased by the plaintiff, Bijan Designer for Men, consists of a two-story retail space situated in the St. Regis; the unit has its own separate entrance on Fifth Avenue, as well as entrances directly from the hotel's lobby and

its mezzanine. Bijan sells luxury-quality men's apparel and accessories, by appointment only, to a group it describes as "a distinguished and select domestic and international clientele of extremely well-to-do and renowned patrons." Bijan's lease of the unit in question commenced in 1981 for a term of 16 years. Bijan asserts that the site in the St. Regis was specifically selected because of the hotel's reputation, clientele, layout, security, and ambiance; it further states that both parties expected Bijan to draw clientele from among the hotel's guests.

On June 30, 1988, the St. Regis temporarily closed, in order to commence the reconstruction and renovation it considers necessary. The planned work is expected to take approximately 14 to 18 months. In the interim, the main doors to the lobby of the hotel are boarded up, and access to the hotel lobby from the street involves entering through a defunct restaurant and being cleared by a security guard.

The plaintiff, which had been notified of the closing by a letter dated May 31, 1988, protested, by a letter dated June 29, 1988, that substantial damage would be caused to its business by the hotel's closing. It informed the landlord that its rent would be paid into an escrow account.

On October 26, 1988, the landlord sent Bijan a letter demanding the payment of rent arrears from July, August, September and October 1988. On November 3, 1988 Bijan commenced this declaratory judgment action, and moved for a *Yellowstone* injunction by order to show cause containing a temporary restraining order which tolled the running of plaintiff's time to pay rent.

The landlord's answer includes a counterclaim for the entire balance of rent for the remainder of the lease term, pursuant to an acceleration clause. Its cross motion seeks dismissal of the complaint and severance of its counterclaims.

It is the plaintiff's position that by closing the St. Regis, the landlord rendered useless Bijan's contractually provided-for access to the hotel, resulting in an actual partial eviction of Bijan. An actual eviction, whether partial or complete, suspends in its entirety the tenant's obligation to pay rent *(see, Barash v Pennsylvania Term. Real Estate Corp.,* 26 NY2d 77, 83; *Fifth Ave. Bldg. Co. v Kernochan,* 221 NY 370).

If there is a factual question as to whether the landlord's action constitutes an actual eviction, issuance of a *Yellowstone* injunction would be appropriate, in order to maintain the

status quo under the lease until the rights of parties have been adjudicated *(see, 144 E. 40th St. Leasing Corp. v Schneider,* 125 AD2d 195, 196; *Jemaltown of 125th St. v Betesh/Park Seen Realty Assocs.,* 115 AD2d 381). However, in cross-moving for summary judgment, the defendant lessor maintains that the dispute is amenable to determination as a matter of law, in view of the lease terms. Specifically, the defendant relies on paragraph 14.A of the lease, which permits the lessor to, *inter alia,* "make such decorations, repairs, alterations, improvements or additions as lessor may deem necessary or desirable either to the Hotel or the demised premises" and further on provides that "the rent shall in no way abate while the decorations, repairs, alterations, improvements or additions are being made and Lessor shall not be liable to Lessee by reason of loss or interruption of the business of Lessee because of the prosecution of any such work or otherwise."

For its part, Bijan points out that the very first paragraph of the lease promises the tenant that "[t]he first floor of the premises shall have access to the Hotel's main lobby" and also that "[t]he second floor of the premises shall have access to the Hotel's mezzanine." Its position is that this right of access may not be abrogated by the landlord's right to repair. In addition, the tenant contends that the implied covenant of good faith and fair dealing prohibits the actions taken by the landlord.

These motions confront the court with competing policies. Restoration and renovation of an old landmark building should be welcomed and encouraged, and in fact, here, the landlord attempted to contractually provide for that right. On the other hand, the rights accorded a tenant, such as the negotiated-for right of direct access to the hotel lobby, must be carefully protected from undue interference, particularly where, as here, that right provides a substantial economic benefit to the tenant. In order to arrive at a determination of the parties' rights, I turn to a review of the cases offered in support of each position.

The defendants cite the case of *Ernst v Straus* (114 App Div 19), in which a tenant ceased paying rent when its landlord entered and occupied a portion of the leased premises in order to make necessary repairs. There, the landlord was granted a judgment for the full amount of the rent, on the basis of a lease clause permitting the landlord to enter the premises to make necessary repairs. The First Department explained that

"alterations and improvements to leased premises, made with the consent of the tenant, do not amount to an eviction, no matter how extensive they may be nor how much they may interfere with the occupancy of the tenant"; thus, the landlord's right to rent was not suspended *(see, Ernst v Straus, supra,* at 21).

Similarly, in *Two Rector St. Corp. v Bein* (226 App Div 73), a landlord, acting pursuant to an exculpatory clause similar to the one in the present matter, constructed a hoist outside the tenant's office window, in order to effectuate certain alterations and improvements to the building. The First Department rejected the tenant's defense of actual partial eviction, and gave judgment to the landlord for the full amount of the rent, again citing the rule that alterations and improvements made with the consent of the tenant do not amount to an eviction *(see, Two Rector St. Corp. v Bein, supra,* at 77).

Here, the tenant certainly consented to renovations; it is less clear, however, whether that consent was so broad as to permit its right of access to be subsumed or negated by those alterations or improvements.

More recently, in *Broadway Copy Serv. v Broad-Wall Co.* (77 AD2d 827 [1st Dept 1980]), where a landlord painted over the clear glass doors leading from the rear of a tenant's store to the building's lobby, it was held as a matter of law that this act did not constitute an actual partial eviction which would excuse the tenant from paying rent. Noting, however, that painting over the glass door prevented prospective customers from knowing the nature of the tenant's business and potentially deprived the tenant of possible sales, the court indicated that the tenant might have a cause of action for compensatory damages *(see, Broadway Copy Serv. v Broad-Wall Co., supra,* at 828).

It is apparent that a landlord's breach of an express or implied lease term does not necessarily result in an actual eviction, but merely gives rise to a cause of action for damages *(see, 487 Elmwood v Hassett,* 107 AD2d 285, 288).

The tenant points to several cases in which a landlord's acts constituted an actual partial eviction. For instance, where a landlord sealed and blocked off a freight elevator which opened directly into tenant's store, it was found that this action constituted an actual partial eviction. *(See, Broadway-Spring St. Corp. v Berens Export Corp.,* 12 Misc 2d 460.) Similarly, in *Hamilton v Graybill* (19 Misc 521), where the

landlord cut off access to a common hallway from the tenant's private office, a partial actual eviction was found, even though the tenant still had access to the hallway from his general, outer office. Likewise, the case of *Seigel v Neary* (38 Misc 297) held that a partial actual eviction resulted where the landlord boarded up and closed off one of the entrances to the tenant's store.

Other cases relied upon by the plaintiff consider situations in which a landlord encroached upon an easement granted to tenants. For instance, in *487 Elmwood v Hassett* (107 AD2d 285, *supra),* a shopping plaza tenant's lease included an express easement to use the plaza's parking area; when the landlord leased two thirds of that parking area to a fast-food restaurant, which proceeded to construct a restaurant on that spot, the court found that the shopping plaza tenant was actually partially evicted by that encroachment.

■ When the facts alleged by the plaintiff are viewed in light of the foregoing cases, it is apparent that the plaintiff's theory of actual eviction cannot be supported. The plaintiff agreed to repairs, alterations, or improvements either in the store or in the hotel, and that the landlord would not be liable for loss or interruption of Bijan's business due to such work. If extensive alterations made upon consent *within* the leased premises cannot amount to an eviction *(see, Ernst v Straus,* 114 App Div 19, *supra),* I fail to see how extensive renovations made upon consent *outside* the leased premises can be said to constitute an eviction. Moreover, where the exculpatory clause is so broad, for the court to construe the clause to permit extensive work except where the hotel must be closed to customers would constitute a rewriting of the contract by the court. Furthermore, although sealing off contracted-for access has been held to constitute actual eviction, here—as the defendants point out—the plaintiff continues to have access to the lobby and mezzanine, albeit a lobby and mezzanine which are part of a hotel undergoing renovations.

■ Nor may Bijan claim that its leasehold included an appurtenant easement over the lobby, either express or implied; the allegation that some of its customers had their drivers drop them off at the St. Regis' 55th Street entrance, where they traversed the St. Regis lobby to Bijan's establishment, is simply insufficient to support the implication of an easement. Thus the *487 Elmwood* case *(supra)* is distinguishable; the closing of the St. Regis lobby entrance does not encroach on Bijan's leasehold interest.

It is apparent that the parties, particularly the tenant, did not contemplate that any building renovation might necessitate a lengthy closing of the hotel. I therefore take the opportunity to note that especially where—as here—the value of the leasehold takes into account the presence of the landlord's clientele, tenants are well advised to provide for the eventuality of temporary closing for renovation, or at least to specify some limits to the exculpatory clause concerning repairs.

In the absence of such a provision, Bijan is left with a situation which may clearly have a negative impact on the value of the leased premises, but which just as clearly does not constitute an actual partial eviction. This is not to say that a tenant in the plaintiff's position is necessarily without recourse. Notwithstanding the exculpatory clause permitting renovations, a right to compensatory damages may exist if the landlord exceeded the rights granted by the lease, and if its actions constitute a breach of another term of the lease, such as a right of access or an implied covenant of good faith or quiet enjoyment (see, 487 Elmwood v Hassett, 107 AD2d 285, 288, supra; Broadway Copy Serv. v Broad-Wall Co., 77 AD2d 827, supra; Parsons School of Design v 21-10 49th Ave. Corp., 136 NYS2d 919).

However, as a matter of law Bijan is not entitled to the declaratory judgment it seeks, namely, that its obligation to pay rent is suspended while the St. Regis is closed for renovations. Summary judgment dismissing the complaint in that regard is therefore granted to the defendants. The TRO previously granted is vacated 72 hours after service upon the plaintiff of a copy of this decision.

The parties go on to dispute whether the defendant's first counterclaim, for accelerated rent, may be decided on this summary judgment motion. Bijan maintains that the landlord did not give it proper notice of default under the terms of the lease and that the landlord therefore has no legal right to that relief. The landlord disputes Bijan's reading of the notice requirement, and contends that the court is presented with a factual question as to whether the notice of default was sent and received, before it can determine whether the landlord is entitled to judgment for the entire term's rent under the acceleration clause.

Lease paragraph 22.A provides that the lessee is in default if it "shall fail to make any payment of * * * rent, within five (5) days after notice of the same is due and payable."

The previous lease paragraph, No. 21, provides that *"All * * * notices * * * which the Lessor may * * * be required to give to Lessee shall be deemed sufficiently given or rendered if in writing and either delivered to lessee personally or sent by registered or certified mail addressed to Lessee at the demised premises * * * and the time of rendition thereof or the giving of such notice * * * shall be deemed to be the time when same is delivered to Lessee or five (5) days after deposited in the mail addressed to Lessee."* Paragraph 23 provides that "If the Lessee is in default as defined in Paragraph 22, then by that fact, thereupon, *without notice,* entry, or action by Lessor * * * B. The rent for the entire balance of the term of the lessee * * * shall accelerate and become due and payable".

Bijan relies on the notice provisions of lease paragraph 21 to contend that the landlord failed to properly notice Bijan of its default. However, the landlord argues that the provisions of paragraph 21 are not the sole method by which they are entitled to give notice—that it merely sets out an agreed-upon method by which notice will unquestionably be sufficient.

■ The parties specifically provided for a method of "sufficient" notice to the tenant. Whether or not other unspecified methods of notice may be sufficient, I hold that where such a drastic result as acceleration of the full term's rent is sought, the type of notice provided for by mutual agreement *must* be adhered to. Since the landlord fails to dispute Bijan's assertion that the specified method of notice was not followed, summary judgment dismissing the defendants' first counterclaim, for acceleration of rent, is appropriate here.