STINSON, LYONS, GERLIN & BUSTA-MANTE, P.A., a Florida professional association, Plaintiff,

v.

BRICKELL BUILDING 1 HOLDING COMPANY, INC., a Delaware corporation, Brickell Building 2 Holding Company, Inc., a Delaware corporation, and Morgan Guarantee Trust Company of New York, a New York corporation, as trustee, Defendants.

No. 89-2424-Civ.

United States District Court, S.D. Florida.

Sept. 27, 1990.

Charles C. Kline, Miami, Fla., for plaintiff.

Alvin B. Davis, Miami, Fla., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, Chief Judge.

Plaintiffs filed this litigation on an emergency basis on October 30, 1989, seeking to enjoin the defendants[1] from continuing a proposed $10,800,000 renovation of its fourteen-story high-rise professional office tower, located at 1401 Brickell Avenue, Miami, Florida.

In March of 1973, the Tenant Law Firm entered into the subject Lease with the Landlord for a period of ten years with two successive five-year options to renew. Effective June 1, 1988, the Tenant exercised its final option renewing the Lease for five years, or until May 31, 1993.

At the time the option was exercised, the Tenant was renting 18,838 square feet of office space, occupying nearly all of the ninth floor. The Law Firm's space was approximately 11,500 square feet on the ninth floor, with the balance of the space sublet to other law firms located on the eighth floor of the building.

At the time the Lease was originally negotiated and executed, the building was recognized as being located in a prestigious location, occupied primarily by law firms and providing first-class service amenities for the users of the building and their clients.

1. As used in this opinion, Brickell Building 1 Holding Company, Inc., and Brickell Building 2 Holding Company, Inc., will be referred to as the "Landlord." The plaintiff will be referred to either as "Tenant" or "Law Firm." There is complete diversity of citizenship between the parties and the plaintiffs, in addition to injunctive relief, are seeking $1,575,000 in damages. Thus, the court has subject matter jurisdiction under 28 U.S.C. § 1332.

In the ensuing eighteen years, there has been a gradual deterioration of the building and its various support systems requiring considerable expense for maintenance and repair. The Landlord, who had been forced to take the building back in foreclosure, found itself attempting to market a "C" quality building that had only a twenty percent occupancy with four remaining tenants at the time of trial.

The Landlord was unable to economically compete with the great number of "A" quality buildings that have been constructed in the immediate Miami business community area in the past eighteen years. The Landlord's old building did not contain the state-of-the-art health, safety, and amenity features offered to lessees in the newer, first-class buildings. The market had also become saturated with over one million square feet of first-class commercial office space in the market area.

The Landlord was faced with a difficult economic choice; either make the necessary financial commitment to bring the building and its systems up to 1990 competing levels by installing state-of-the-art health, safety, and amenity systems in the building; or continue to compete with newer buildings, with the probability that its building would remain empty. From the evidence, it is clear that the Landlord, in deciding to repair and modernize the building, based his decision upon an economic judgment unrelated in any way to dissatisfaction with the plaintiff Law Firm as a Tenant.

The Tenant Law Firm takes the position that the Lease, which will expire on May 31, 1993, has been breached by the Landlord in that the renovations to the building are so substantial that they have rendered the leased premises essentially unfit for the purposes of the operation of the law office during renovations. The Tenant is in the process of negotiating a new lease in a new building at a different location, which will be ready for occupancy on December 1, 1990. In this suit, the Tenant has sought to enjoin the Landlord from going forward with the proposed repairs and improvements to the 1401 Brickell building until December 1, 1990, at which time the Law Firm proposes to vacate the presently-leased space and move to their new office.

In addition to its claim for injunctive relief, the Tenant seeks to recover the market value of its remaining leasehold interest from December 1, 1990, through May 31, 1993, the present value of its leasehold improvements, and the cost of having to prematurely move and purchase new improvements. (p. 2 Joint Pretrial Stipulation.)

An item of damage, although not designated as such in the pretrial stipulation of August 3, 1990, but upon which the Court permitted the parties to present evidence during the seven-day nonjury trial commencing August 6, 1990, was for the loss of profits suffered as a result of disruptive construction activity by the Landlord. This item of damage (approximating $625,000) has been objected to by the Landlord as not being an issue properly presented in the pleadings for adjudication. Attorney members of the Tenant Law Firm testified that their estimation of lost profits to the plaintiff was $561,000. Additionally, plaintiff seeks, on behalf of three law firm subtenants, the amounts of $35,000, $60,000, and $38,000, respectively, for loss of profits.

The Landlord argues that the construction activities, either undertaken or contemplated by the Landlord, are specifically authorized by the provisions of the lease contract between the parties. In urging the Court to interpret the Lease contract as written, the Landlord points out that the Lease does not contain a covenant of quiet enjoyment and suggests that the following provisions of the Lease, in clear and unambiguous language, permit the renovations and improvements:

13. Landlord shall have the right to make or build additions, alterations, or improvements to the building of which the demised space is a part as landlord deems advisable without liability to the Tenant.

14. ... No claim or compensation shall be made by reason of loss, damage, inconvenience or annoyance arising from the necessity of repairing any portion of

said building, or its plant or appurtenances, however such necessity may occur.

24. Landlord, or any of its agents, shall have the right to enter said premises during all reasonable hours to examine the same or to make such repairs, additions, or alterations as may be deemed necessary for the safety, comfort of occupants thereof, or preservation of said premises or of said building ...

The Landlord suggests that the Court, in enforcing the provisions of the Lease contract, give effect to the contract provisions agreed to by the parties in a manner that is as harmonious as possible with the Tenant's implied right to quiet enjoyment of the leased premises. In so doing, the Landlord suggests that the Court balance the contractually reserved rights of the Landlord to renovate with the Tenant's right to protection against "undue interference" and determine whether or not the renovation has proceeded in a responsible, reasonable manner, consistent with sensitivity to the Tenant's rights and a minimum of disruption and inconvenience.

The parties have stipulated to the following findings of fact (p. 4–6 Joint Pretrial Stipulation) concerning the scope of the remodeling and repair work commenced by the Landlord in July of 1989:

New life and fire safety systems will be installed, including bathrooms for handicapped persons, fire sprinkler systems, a new fire line, and pressurizing of the fire stairs.

Asbestos will be removed.

The existing plaza will be removed and replaced.

The open portion of the plaza under the building will be enclosed.

An enclosure will be built to connect the building tower with the garage.

The perimeter of the building will be excavated and new footings will be poured.

The exterior walls consisting of precast concrete and windows will be removed and replaced with new curtain wall consisting of precast concrete and windows.

An air-conditioning cooling tower and two air-conditioning chillers will be replaced.

The high pressure air-conditioning ducts on each floor except those occupied by Tenant will be reworked. However, air-conditioning duct work running around the perimeter of the building on the Tenant's floor may have to be moved and reworked during the installation of the curtain wall.

The mechanical rooms on each floor except those occupied by Tenant will be refurbished.

The parking garage will be sprinklered. A trash chute has been erected outside of one of Tenant's windows. It is the only such chute involved in the project. It runs the full height of the building. The fountain has been demolished and the ground level construction area has been boarded off.

The Tenant Firm agreed, in the Lease contract, that the Landlord could make such improvements as the Landlord deemed advisable "without liability to the Tenant." The Firm similarly waived any claims for "loss, damage, inconvenience or annoyance" arising from necessary repairs or from alterations necessary for the safety or comfort of the occupants of the building. The Court finds the language in these provisions to be clear and unequivocal.

### I. The Contract of the Parties

The rights and obligations of both sides to this controversy were fully agreed upon in the clear language of the lease contract they executed seventeen years ago. Each party reserved unto itself certain clear and unambiguous rights and obligated itself to clear and unambiguous obligations. They are bound by their own agreement, and the Court has no alternative except to enforce the plain provisions of the lease contract.

Under the law of Florida, every provision in a contract should be given meaning and effect. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So.2d 938 (Fla.1979). It must be assumed by the Court in construing contracts that each clause in the document has some purpose

and that each was intended to be implemented by the parties. *Hillsborough County Aviation Author. v. Cone Bros. Contracting Co.*, 285 So.2d 619 (Fla. 2d DCA 1973). Those intentions of the parties at the time they entered into the contract are to be determined from the unambiguous terms of the agrement itself. The contract represents the deliberate distribution of benefits and burdens by the parties themselves. That allocation should not be disturbed by the Court. *See Meyer v. Caribbean Interiors, Inc.*, 435 So.2d 936 (Fla. 3d DCA 1983). In this contract the Court finds no written provisions inconsistent with the proposed renovations by the Landlord.

In summary, the lease contract permits the Landlord to: (a) make necessary repairs, whatever the cause of the necessity; (b) make repairs, additions, or alterations for the safety or comfort of the occupants; and (c) make additions, alterations, or improvements which the Landlord deems advisable. These rights should, of course, be exercised in a reasonable manner, consistent with the rights reserved to Tenant.

The Landlord's planned renovation of the building was discussed in detail at trial by the project manager, the architect, and the general contractor. Each of the individual projects planned, as set forth in the plans and specifications, is specifically covered by the express language of the Lease of the parties.

The Landlord's plans to upgrade and modernize the elevators, to replace the air-conditioning cooling tower and chillers, to replace the leaking roof, and to refurbish all of the bathrooms in the building are all items of necessary and reasonable maintenance contemplated by the parties.

A significant number of the planned changes to the building deal with fire and other safety features needed to bring the building into compliance with current governmental code requirements.

The Tenant Firm does not dispute that the following listed improvements will make the building measurably safer for the benefit of all occupants:

Removal of asbestos

Sprinkler Systems

Pressurized fire stairs

Fire life safety systems, such as smoke detectors, pull stations, and exit signs

Smoke dampers

Elevator recall systems

Fire control rooms at ground level

Handicapped ramps

An enclosed connector between the building and the garage.

These, as well as the balance of the renovations, fall within the category of improvements to the building that the Tenant agreed in the Lease could be done "without liability to the Tenant."

The enclosure of the balconies on the top two floors and of a portion of the plaza at ground level is work which will be taking place near the roof or on the ground floor, significant distances away from the Firm's eighth- and ninth-floor space. Much of this work is similar in nature to the normal tenant improvements which every tenant in every building is required to accommodate every time another tenant moves in or out of the building.

The item of installation of greatest concern to the Tenant is the installation of a new curtain wall to the exterior of the building replacing the existing precast concrete "skin" of the building. This curtain wall system below the penthouse floors will be installed from the top down throughout the fourteen floors. The six 70–foot elevations of the building will be done at different times over an approximate six- or seven-month period.

The Landlord's contractor gave detailed testimony concerning the "weekend plan." This plan has been implemented by the Landlord in an effort to minimize the disruption of the Tenant's law office business. The plan provides for the removal and replacement of the skin on the Tenant's floors during weekends. The removal of the precast concrete panels requires the removal of two feet of the Tenant's ceiling, including the ceiling tile and the gridwork holding the ceiling up at the perimeter of the building. It also entails the removal of all window drapes and shades, and any

air-conditioning and light fixtures that might be in that area of the ceiling.

All partition walls separating the Tenant's offices will be cut back either one or two feet from the perimeter of the building. These partitions are covered with a variety of finishes, including wood paneling, fabric wall covering, or glass. In some cases, the partition walls at the point where they intersect with the exterior of the building include built-in credenzas, shelving, and electric and phone outlets.

The carpet in each perimeter office will be rolled back at least two feet, and at least four feet of clear working space will be required in each office, thus necessitating the removal or relocation of the lawyers' furniture and files.

The foregoing work will be done on one 70–foot elevation at a time until all six elevations are completed. The weekend plan envisions that the Tenant's walls, ceilings, and other improvements are supposed to be restored no later than the conclusion of the following weekend.

The tenant does not challenge the fact that the curtain wall installation will be a major improvement. The new skin will permit more light and less heat to enter the building. It is substantially more energy efficient than the current outer wall. It will improve the appearance of the building. In any event, the undisputed testimony is that major repairs or renovations of the existing precast walls, if not done now, would be necessary in the very near future.

█ The plain language of the Lease demonstrates that the parties contemplated and agreed to permit the type of work now underway at the building. The Lease further indicates that the parties considered the "damage, inconvenience, and annoyance" that naturally flow from such activities, and in the complex allocation of benefits and burdens that takes place in the negotiation of every commercial lease, determined and agreed that the Landlord would not be liable to the Tenant under these circumstances.

As set forth above, there is no *express* covenant of quiet enjoyment. The Tenant relies upon a theory of implied covenant. *Hankins v. Smith*, 103 Fla. 892, 138 So. 494 (1931), 49 Am.Jur.2d 338.

Landlord and Tenant agree that *Hankins v. Smith*, supra, is the seminal case in Florida giving rise to an implied covenant of quiet enjoyment. The language and logic of *Hankins* apply here.

"... *in the absence of an express covenant inconsistent therewith*, the ordinary lease of realty raises an implied covenant that the lessee shall have the quiet and peaceable possession and enjoyment of the leased premises ...". *Id.* 138 So. at 496 (emphasis supplied).

That language is particularly instructive here because there are, in fact, three "express covenant[s] inconsistent" with the covenant Tenant seeks to import into its Lease. *Hankins* does not go on to say what should occur when there are such express covenants, since there were none in that case. The clear and obvious implication of the quoted language is that the express covenants are to be given effect and that the implied covenant is a relative provision, the precise meaning and effect of which depends upon the express terms with which it is traveling.

This in turn directs the Court back to the basic concepts of contract construction. The Court's task here is not to eliminate the Landlord's express rights in favor of the Tenant's implied covenant, but to give both the express provisions and the implied provisions meaning and effect. The Court is called upon to reconcile the Landlord's obvious right to maintain and improve its building, with the Tenant's implied right to carry on its business without undue or unnecessary interruption or distraction. The Landlord's express rights were granted by the Tenant when the Lease was executed. The provisions are by definition intentional, unequivocal, and on their face authorize what is occurring. The role of the Court under these circumstances is to give effect to these provisions in a manner that is as harmonious as possible with the Tenant's implied rights.

Obviously, reconciliation of these potentially inconsistent objectives depends on the

particular facts of this particular Lease and this particular renovation. Nonetheless, these are decisions dealing with comparable situations that are instructive. In *Bijan Designer for Men, Inc. v. St. Regis Sheraton Corp.*, 142 Misc.2d 175, 536 N.Y. S.2d 951 (N.Y.Sup.Ct.1989), *aff'd*, 150 A.D.2d 244, 543 N.Y.S.2d 296 (N.Y.App. Div.1989), a retail tenant in the lobby of a hotel sought declaratory judgment that it had been partially evicted as a consequence of the hotel's closing during major renovations. The lease contained language essentially identical to Paragraph 13 here, providing that the hotel would not be liable for loss or interruption due to such renovations. In language that is also apt here, the Court commented that:

> In Manhattan, especially, older buildings are constantly being gutted or renovated in order to keep pace with current real estate needs. Renovations and rehabilitative work are commonly performed by the owner or developer while tenants at the building are expected to carry on their customary commercial enterprises. Often, the extent and duration of the work is unanticipated by the tenant.

*Id.* 536 N.Y.S.2d at 952.

Balancing the contractually reserved rights of the Landlord to renovate with the Tenant's right to protection against "undue interference," the Court declined the Tenant's request that the Court modify the contract provision to require the hotel to remain open, requiring, in the Court's word, a "re-writing" of the contract. The renovations were permitted to continue. The Court did allow for the possibility of damages, but only "if the landlord exceeded the rights granted by the lease...." *Id.* at 955.

Another case involving the balancing of rights in a similar lease is found in *Hardwick, Cook & Co. v. 3379 Peachtree, Ltd.*, 184 Ga.App. 822, 363 S.E.2d 31 (1987). In *Hardwick*, as here, a major renovation of a commercial building was undertaken, including the installation of a glass "shell" around the existing building. As here, the renovations were contractually authorized in the lease. The tenant waived any claim for damages related to the renovation unless landlord failed to carry out the work in such a manner as to cause the tenant the least amount of inconvenience. The landlord presented evidence of the methods it intended to employ, including, as here, performance of the noisiest construction work during evening and weekends. Summary judgment in favor of the landlord was affirmed because the evidence established that the landlord was conducting itself in the least intrusive and least inconvenient manner, and tenant failed to tender any evidence to the contrary.

Here, as in *Hardwick*, a substantial portion of the evidence at trial was devoted to a description of the Landlord's efforts to exercise its contractual rights to repair and renovate in a responsible and reasonable manner. Once the determination was made that the building would be renovated, Landlord and its representatives, including architects and contractors, began meeting with the Tenant (and with other tenants) to advise them of what was contemplated. Various options were proposed to accommodate the Tenant during the renovation, all of which represented a substantial economic undertaking by the Landlord. Among the options:

> Build out renovated space above Tenant's floors to suit Tenant's needs and move Tenant to that new space, all at Landlord's expense. Tenant was free to depart at the end of the original lease period or negotiate a new long-term lease.

> Pay Tenant's moving expenses to a comparable Brickell area office building and pay any rental increase for the balance of the Lease. Buildings proposed are those regarded as comparable by both Landlord's and Tenant's experts.

> Tenant to terminate Lease at that time with substantial cash payment from Landlord as an accommodation to the Tenant.

The Tenant decided to move to a new building and did not accept any of the Landlord's suggested options. Three of the other tenants accepted and remained in the

building in new space built out by the Landlord.

The Court finds that the Landlord has been sensitive to the nature of Tenant's law business activities and has implemented a number of decisions to minimize disruption and inconvenience to the Tenant. Some of these decisions were in response to objections of proposed work by Tenant:

a. Fire life safety systems, including a device to automatically recall all elevators to the lobby in case of fire, smoke dampers, and similar devices, will not be installed on Tenant's floors.

b. No new fire cabinet will be installed on Tenant's floor.

c. There will be no sprinkler system installed on Tenant's floors.

d. There was no asbestos removal on Tenant's floors.

e. No handicapped bathroom will be installed on Tenant's floors or on the floor above the Tenant's space. Extra plumbing work will be done to route the pipes for upper floors around Tenant's space.

f. Air-conditioning ducts will not be raised in Tenant's lobby area.

g. There will be no HVAC/mechanical room renovation on Tenant's floor.

h. The bathrooms on Tenant's floors will not be renovated.

i. A new center slab will not be poured on Tenant's floors.

j. A special consultant was retained to design a plan for the installation on weekends of the new curtain wall system for the building. That plan has been incorporated into the plans and specifications for the building.

k. To accommodate the "weekend plan," the curtain wall will be installed from top to bottom rather than from the bottom to the top of the building.

l. Drilling for the installation of the curtain wall, by far the most intensive drilling work in the entire project, will be done after 8:00 p.m. during the week or on weekends.

m. Major air-conditioning replacement work has been scheduled for a weekend during the coolest time of year.

n. Workmen and work materials will utilize the service elevator only. The service elevator will be closed off from the Tenant's floors.

o. Full elevator service will be maintained for the Tenant, separate from the service elevator, for the entire period of renovation.

p. A separate building entrance has been established for the workmen.

q. A separate parking area has been established for the workmen.

r. Large painted fences have been constructed around the site, with signs identifying the building and indicating that a renovation is underway.

The evidence clearly establishes, and the Court so finds, that the Landlord made these accommodations to the Tenant out of a sincere desire to cause the Tenant as little inconvenience as possible, given the urgent need of the Landlord to renovate the premises, to bring it up to acceptable rental standards. Real estate experts have testified in these proceedings that the downtown Miami and Brickell Avenue commercial business areas presently have over 1,100,000 square feet of space available for rental directly from landlords, and more than 360,000 square feet of additional space available for sublease. In fact, new space is coming on the market faster than existing space is being leased. The Court finds that this is the motive prompting the landlord to decide to repair, renovate, and improve the building at 1401 Brickell Avenue, and that there is no suggestion of motive to deliberately cause the tenant to be inconvenienced to the point where it would vacate the premises. This finding is made given the fact it has been considered in those cases where courts have been called upon to determine the reasonableness of the Landlord's activities.

The Court further finds that there is no evidence to support the Tenant's theory of constructive eviction. The evidence is clear that the tenants have been able to operate, although at inconvenience and under tiring circumstances, their law business at more

than ninety percent of normal capacity. They did not let any of their clients suffer, but saw to it that the clients were serviced and their requirements met regardless of personal inconvenience. The Tenant's evidence falls short of establishing a claim for constructive eviction.

The Tenant's claims for lost profits for itself and its three subtenants, cost of purchasing new furniture for their new offices, interest, and moving costs have not been established by the preponderance of evidence. A great deal of the testimony on these items was based on estimates, conjecture, and in a number of instances, pure speculation.

Although the Court is convinced, and so finds, that the Landlord has done its best to minimize the noise, inconvenience, and disruption to the Tenant's law business, there have been, and will be, periods of time during the removal of the concrete precast outer skin of the building and the installation of the new curtain walls, when the intrusion into the Tenant's specific space is such (although it could not have been avoided) that it requires redress.

The Court is therefore of the opinion that a twenty percent reduction in the rent normally due during the weeks necessary for the installation of the curtain walls, on the space occupied by the Tenant on the eighth and ninth floors, be computed and rebated by the Landlord to the Tenant. Accordingly, it is

ORDERED, ADJUDGED and DECREED that the application for permanent injunction and damages prayed for in the complaint be, and they are hereby, DENIED. It is further

ORDERED, ADJUDGED and DECREED that the Landlord shall, within thirty (30) days hereof, tender to the Tenant Law Firm twenty percent (20%) of the rent otherwise due for the period of time of the installation of the curtain walls in accordance with this Opinion.

DONE AND ORDERED.